541 A.2d 1260 (1988)
In the Matter of D.R. Appeal of R.R.
No. 85-1588.
District of Columbia Court of Appeals.
Argued October 6, 1987.
Decided May 4, 1988.
Marion E. Baurley, Washington, D.C., for appellant R.R.
Charlotte Brookins-Pruitt, Asst. Corp. Counsel, with whom James R. Murphy, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee District of Columbia.
Rebecca L. Burke, Washington, D.C., for appellee D.R.
Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.
*1261 FERREN, Associate Judge:
R.R. appeals from a denial of her petition to set aside her relinquishment of parental rights to her son, D.R., on the ground that the relinquishment was ineffective or, alternatively, that it was effectively revoked within ten statutory days. We remand the case for an evidentiary hearing to ascertain the relevant facts and for further proceedings based on the trial court's factual findings. In particular, the court shall determine whether R.R. had timely notice of the verified writing requirement for revocation and, if not, whether, during the ten statutory days following R.R.'s execution of the relinquishment, she had decided to revoke and effectively communicated that decision. Furthermore, in the event the trial court determines that R.R. did not revoke her relinquishment, the court shall determine whether the relinquishment itself was valid.

I.
D.R. was born on March 16, 1984. When he was about a month old, his mother brought him into Children's Hospital where he was diagnosed to have suffered multiple bone fractures and bruises. The day after, on April 16, the District of Columbia filed a neglect petition. D.C.Code § 16-2320 (1981 & 1987 Supp.). On the same day, Judge Riley ordered D.R.'s placement in the custody of the Department of Human Services (DHS) pending adjudication of the petition. The court then appointed separate counsel for the child and for the mother and ordered the mother, R.R., to undergo a forensic psychiatric examination.
On June 13, R.R., through counsel, stipulated that she had been suffering from schizophrenia, which had impaired her ability to care for D.R., and that D.R.'s injuries had resulted from one of her schizophrenic episodes. R.R. also stipulated that she had been an outpatient at Saint Elizabeths Hospital for two years. On the basis of these facts, she further stipulated that D.R. was a neglected child, D.C.Code § 16-2301(9)(A), (B), and (C) (1981), who should be committed to the care and custody of DHS pursuant to D.C.Code § 16-2320(a)(3)(A) (1987 Supp.). R.R. reserved supervised visitation rights to be arranged by her social worker, Kris Laurenti. The stipulation also provided that, should her psychiatrists ever conclude that R.R. had improved sufficiently to regain custody, a hearing would be held to reappraise D.R.'s placement. The court approved the stipulation.
The court reviewed this case on December 13, 1984, and on April 25, 1985. These reviews continued the existing custody arrangement without substantial change in the conditions. On July 3, 1985, after a psychiatrist had conducted a forensic examination and found her competent to make the decision, R.R., apparently without advice of counsel, signed a form in the presence of her social worker relinquishing her parental rights. See D.C.Code § 32-1007(f) (1987 Supp.).[1] The form stated that the social worker had explained the alternatives to relinquishment, such as emergency care and supportive services. The form further stated:
Therefore, after being fully informed and giving due consideration to the alternatives available, I now relinquish my child and surrender those rights to the Mayor of the District of Columbia, or his designated agent, as provided by Section 32-1007 *1262 of the District of Columbia Code (1981 edition) [1987 Supp.].
I understand that:
1. I CAN REVOKE THIS RELINQUISHMENT WITHIN 10 CALENDAR DAYS FROM THE DATE OF THIS RELINQUISHMENT FORM.
After signing this form, R.R. telephoned her court-appointed counsel in the neglect proceeding either the same or the next day, advised him of the relinquishment, and, according to counsel, told him that "she was satisfied with what she had done." Her attorney apparently gave her no further advice on the matter. According to the government, on July 5, two days after signing the relinquishment form, R.R. telephoned DHS and spoke with Laurenti's supervisor. During this conversation, according to the government, R.R. said that she had changed her mind and wished to revoke her relinquishment of parental rights; the supervisor told her to speak directly with Laurenti. R.R. apparently did not contact her attorney about this change of mind. On July 12, nine days after R.R. had signed the relinquishment form, Laurenti apparently reached R.R. on the telephone. This time, according to the government, R.R. said that she wished to abide by her July 3 decision to relinquish and thus no longer wanted to revoke. On July 15, the ten day statutory period for automatic revocation of the relinquishment expired (the tenth calendar day, July 13, was a Saturday). See D.C.Code § 32-1007(c) (1987 Supp.).[2]
On October 4, 1985, R.R., through her court-appointed attorney in the neglect proceeding, filed a petition in Superior Court to vacate her relinquishment of July 3, arguing that R.R. had retained parental rights to D.R. First, she said, relinquishment was defective because it had not been executed in the presence, or with the knowledge, of her attorney and thus was not an informed waiver of parental rights. Second, she argued, even if the relinquishment was effective, R.R. had nullified it by informing Laurenti's supervisor, within ten statutory days, of her decision to revoke the relinquishment. The government and counsel for D.R. opposed the petition.
On October 24, Judge Graae held a hearing on the motion to vacate the relinquishment. Counsel for R.R. did not request an evidentiary hearing; he conceded agreement among the parties on "the salient facts" drawn from the government's written opposition to R.R.'s petition to vacate relinquishment. Accordingly, the trial court did not take testimony, and, as a consequence, what occurred between July 3 and 15, 1985, has not been judicially determined. Instead, the court based its conclusions, in effect, on stipulations of the parties (derived primarily from the government's written opposition to R.R.'s petition to vacate relinquishment) and on brief arguments of counsel. The court ruled that R.R. had "failed to meet her burden in showing that the original relinquishment was invalid and [that] her purported revocation [was] effective":
Finallyhowever desirable it may be  there is no statutory or other requirement that a relinquishment be executed with advice of counsel.1 Secondly, the social worker in this case took pains to refer [R.R.] for a forensic screening because of her mental health history. That screening showed her to be competent to make the decision she ultimately made. Thirdly, and finally, the form she executed..., signed and notarized in the presence of a witness and the social worker, fully explains her options and rights. There is no allegation of coercion, fraud, or mistake of fact and no evidence, other than the fact she did not *1263 consult with counsel, to support an argument that her decision was not intelligent and informed. The original relinquishment is therefore legally valid.
The next inquiry turns on the effect of [R.R.]'s telephoned attempt to revoke and subsequent decision to stand by her original relinquishment before the 10 days had elapsed. That the telephoned revocation is legally insufficient is beyond dispute given the clear language of the statute. Her subsequent call on the ninth day served merely to reaffirm her legally sufficient relinquishment executed on July 3rd. Had she truly intended to revoke, she could have contacted her attorney to take appropriate action, as she did when she called him to advise that she had relinquished her parental rights. Indeed, the record is clear that she at all times knew how to reach Mr. Speidel [her attorney] and that he was available to advise and act in her behalf. The Court can only conclude that [R.R.] was, at most, wavering in her original resolve to relinquish her parental rights and, by virtue of her call on the ninth day, never made a firm decision to revoke. 32 D.C.Code § 1007(c)'s requirement that revocations be made in a verified writing was specifically designed to preclude just this kind of uncertainty and to give finality to relinquishment.
1 The Court was advised that it is common procedure not to invoke counsel's advice when a parent voluntarily relinquishes parental rights. Although the Court does not believe this procedure is constitutionally defective, it is clearly a bad practice inasmuch as counsel has been specifically appointed by the Court to represent parents' interests.

II.
Two issues control the status of R.R.'s parental rights: (1) whether R.R. executed a valid relinquishment on July 3, 1985, and, if so, (2) whether, in the ten statutory days thereafter, she effectively revoked that relinquishment. If R.R. had revoked by July 15, then it is irrelevant whether her original relinquishment was valid. D.C.Code § 32-1007 (1987 Supp.) provides the statutory framework for ascertaining parental rights in relinquishment and revocation situations. See supra notes 1 & 2. Of particular relevance to the revocation issue are §§ 32-1007(g) and (h):
(g) The relinquishment form used by the child-placing agency shall contain the following notice to the parent in clear and conspicuous language:
(1) Notice to the relinquishing parent of the parent's automatic right of revocation within 10 calendar days from the date of relinquishment;
* * * * * *
(h) Relinquishing parents shall be orally advised of their rights as described in subsection (g) of this section. The child-placing agency shall orally advise the relinquishing parent as to the nature and consequences resulting from the execution of the relinquishment document prior to relinquishment.
The relinquishment form provided by DHS, supra, which R.R. signed on July 3, did not contain notice that revocation within the ten day statutory period must be contained in "a verified writing." D.C. Code § 32-1007(c), supra note 2. The notice in the relinquishment form merely said: "I can revoke this relinquishment within 10 calendar days from the date of this relinquishment form." This is insufficient notice under § 32-1007(g)(1), of the parent's automatic right of revocation, for when a statute requires notice of a right, we believe that necessarily implies notice of all the material procedures required for asserting that right. More specifically, in this case, when the statute requires the agency to advise the parent of her right to revoke within ten daysand has provided in another subsection that the revocation must be made by "a verified writing"the statute, by implication, requires the agency to notify the parent, through the relinquishment form, that her right to revoke is premised upon her exercising that right not only within the time limit but also with a verified writing.
Our reasoning follows from our standard approach: when one interprets a portion of a statute, such as subsection (g)(1), its meaning must "`be derived not from the reading of a single sentence or section, but *1264 from consideration of [the] entire enactment against the backdrop of its policies and objectives.'" Carey v. Crane Service Co., Inc., 457 A.2d 1102, 1105 (D.C.1983) (quoting Don't Tear It Down v. Pennsylvania Avenue Development Corp., 206 U.S.App.D.C. 122, 128, 642 F.2d 527, 533 (1980)). When thus viewed as a whole, the statute requires the relinquishment form to notify the parent of the two requirements the Council of the District of Columbia set out for "automatic revocation of the relinquishment of parental rights[:] ... a verified writing within 10 days of executing a legal relinquishment." REPORT OF THE COMMITTEE ON THE JUDICIARY ON BILL No. 5-135, DISTRICT OF COLUMBIA RELINQUISHMENT FOR ADOPTION REFORM ACT OF 1983, at 7 (Nov. 16, 1983) ("Report").
The question then becomes: what is the consequence of the failure to afford R.R. adequate written notice under § 32-1007(g)(1) of her right to revoke her relinquishment of parental rights? At best, from the government's point of view, the notice R.R. did receive from the relinquishment form was ambiguous as to whether the right of revocation was, or was not, subject to a writing requirement. In other areas of administrative law, we have emphasized the importance of eliminating ambiguity, and, where we have found ambiguity, we have construed it against the government agency that drafted the language.[3] Accordingly, because DHS created the ambiguity here, DHS should be held to a reasonable inference from the form: R.R. could effectuate a revocation as long as she did so within the ten day limit, whether orally or in writing.
The legislative history of the amended § 32-1007 fully supports the conclusion that the ambiguity should be construed against DHS. Before 1984, there was no automatic right of revocation. Once a parent relinquished rights to her child, she could revoke only upon written consent of all parties to the relinquishment, D.C.Code § 32-1007(a) (1981), or by court order upon a showing that relinquishment had been involuntary. J.M.A.L. v. Lutheran Social Services of National Capital Area, Inc., 418 A.2d 133, 136 (D.C.1980). In 1984, the Council of the District of Columbia amended the statute for the express purpose of "authoriz[ing] birth parents a limited automatic right to withdraw their consent to the relinquishment of parental rights." Report at 2. In adopting the amendment, the Council took into consideration the executive branch's "support[] [of] any effort that will strengthen parental rights and permit a child to remain with the natural parents protecting the rights of the natural parents by providing them an opportunity to rethink their decision." Id. at 7. The legislative history, therefore, clearly indicates the Council's intent to provide special protection for parents who decide to revoke within a short period of time after the relinquishment. It would be inconsistent with this legislative intent to nullify a birth parent's attempted oral revocation within the ten day limit because she had not been properly informed of the need for a verified writing and, hence, had failed to execute one. In sum, as a result of DHS's failure to include in its relinquishment form a notice of revocation rights calling for a verified writing within ten days, R.R. is not necessarily precluded from having effectuated a timely oral revocation.
There is, nonetheless, the question whether DHS's failure to comply with § 32-1007(g)(1) in this instance may have been harmless. If R.R. was timely advised of the verified writing requirement, either by a representative of DHS pursuant to § 32-1007(h) or someone else, such as her attorney, she would not reasonably be able to argue, on the basis of the ambiguous DHS form, that the statute permitted oral *1265 revocation within the ten day limit. More specifically, if R.R. had been personally informed of the writing requirement before July 15, then that knowledge presumably[4] would preclude her claiming she had validly revoked her relinquishment.
Because the relevant facts during the crucial ten statutory days have yet to be judicially determined, an evidentiary hearing is necessary to ascertain, first, whether R.R., during the ten days, had actual knowledge of the requirement for a verified writing. If the court were to find she was not actually informed of that requirement, the court would then have to determine whether R.R. in fact orally had revoked her relinquishment or instead "was, at most, wavering in her original resolve to relinquish her parental rights, and by virtue of her call on the ninth day, never made a firm decision to revoke" (as the trial court found solely on the basis of the colloquy with counsel at the motion hearing).[5] If the court finds that she had revoked, that would obviate any need to inquire into the validity of the original relinquishment, and, as a consequence, R.R.'s parental rights to D.R. would have to be restored.[6]
On the other hand, if the court, after an evidentiary hearing, were to find either that R.R. had timely knowledge of the verified writing requirement or that she never had revoked her relinquishment for lack of resolve or for some other reason, then the status of R.R.'s parental rights would be contingent upon a determination of the validity of the initial relinquishment. We turn, therefore, to that inquiry.

III.
The only argument advanced on R.R.'s behalf in the trial court for invalidating her July 3 relinquishment was that she had executed the form outside the presence, or apparently without the advice, of her court-appointed attorney in the neglect proceeding. On appeal, her new counsel presents, for the first time, the argument that the relationship between R.R. and her social worker (who had helped effect the relinquishment) was one marked by coercion, and hence that any relinquishment resulting from that relationship is presumptively involuntary and, accordingly, void. Counsel also urges that the trial court erred in placing the burden of proving involuntariness on R.R. We refrain from assessing whether these two newly alleged errors caused a miscarriage of justice in the trial court. See Scoggins v. Jude, 419 A.2d 999, 1002 (D.C.1980); District Hauling & Construction Co. v. Argerakis, 34 A.2d 31, 32 (D.C.Mun.App. 1943). R.R. is free to assert them on remand. We thus limit ourselves to the relinquishment issue presented to the trial judge.
D.C.Code § 16-2304(b)(1) (1987 Supp.) provides:
When a child is alleged to be neglected or when the termination of the parent *1266 and child relationship is under consideration, the parent ... is entitled to be represented by counsel at all critical stages of the proceedings, and, if financially unable to obtain adequate representation, to have counsel appointed in accordance with rules established by the Superior Court of the District of Columbia.
In April 1984, the court, pursuant to this section, appointed counsel for R.R. in the neglect proceeding. After finding D.R. to be a neglected child, the court took both the mother and the child under its supervision, conducting periodic reviews of the situation on December 13, 1984, April 25, 1985, and September 9, 1985. Accordingly, when R.R. executed the relinquishment form on July 3, 1985, she was subject to the court's continuing jurisdiction over her neglect of D.R.
By purporting voluntarily to relinquish her parental rights, R.R. did not necessarily take herself outside the neglect framework. When a mother is under court supervision in a neglect proceeding, where the result eventually could be court-ordered termination of parental rights, there is a possibility that an ostensibly voluntary termination is the "system's" way of effecting the ultimate sanction for neglect without taking the time, or taking on the burden, of defense counsel and the court. This possibility may be small, or largewe do not know. But, as a matter of appearance, a voluntary termination of parental rights while a mother is under the jurisdiction of the court, but outside the court's direct supervision of the termination, is more than a little suspect. Accordingly, we conclude that any attempt to surrender parental rights through voluntary relinquishment while the mother remains under the court's neglect jurisdiction must be regarded as a "critical stage" under § 16-2304(b)(1), affording her a statutory right to counsel.
On July 3, 1985, therefore, R.R. had a continuing right to counsel in resolving her parental rights over D.R. This means R.R. had a right to know that her attorney in the neglect proceeding was available for consultation about any suggested relinquishment and that she was entitled to representation by counsel at the time of the relinquishment procedure. R.R.'s social worker accordingly had a duty to inform her of that right before proceeding with the relinquishment. R.R. presumably could waive the right to counsel, but she was entitled to be alerted to that right.[7]
R.R.'s counsel apparently did not advise her about relinquishment either before or during the relinquishment procedure. Nor does the record indicate whether she was advised or otherwise aware of her right to counsel or, if she was, whether she waived the right.
If R.R. waived her right to counsel then, of course, her relinquishment was valid (subject to any other argument against relinquishment advanced on remand). But, if she was not advised of her right to counsel before the relinquishment, there is a serious question whether a waiver was possible. A failure to inform R.R. of her right to counsel might not preclude a waiver if R.R. was clearly aware that her counsel was available for this purpose, knew how to reach him, and rationally decided not to involve him. The trial court concluded that "[R.R.] at all times knew how to reach [her attorney] and that he was available to advise and act in her behalf." The court did not, however, find that she knew he was available to advise her on relinquishment. An evidentiary hearing, therefore, would be necessary to determine whether R.R. was aware of her attorney's availability and knowingly and voluntarily waived the right to use him.
R.R.'s conversation with her attorney shortly after executing the relinquishment form may have cured much of the potential harm from his not being present at the relinquishment or even advising her on the legal implications of relinquishment before she signed the form. Put another way, representation by counsel as to the automatic *1267 right of revocation might have eliminated the harm from a failure to provide counsel for the relinquishment itself. On the other hand, that possibility cannot be resolved without an evidentiary hearing.
Remanded for further proceedings consistent with this opinion.
ROGERS, Associate Judge, concurring in part and dissenting in part:
In this appeal the court is presented with another occasion on which to construe the requirements of the District's statute on the termination of parental rights. The present form of the statute, of recent vintage, reflects a determination by the Council of the District of Columbia, in accordance with that of the surrounding jurisdictions, that birth parents should have a period of time within which to revoke a prior relinquishment of their rights to their child. The Council Committee on Human Services explained that the bill "supports the District's policy of strengthening opportunities for a child to grow up in his or her own family." REPORT OF THE COMMITTEE ON HUMAN SERVICES ON BILL NO. 5-135, DISTRICT OF COLUMBIA RELINQUISHMENT FOR ADOPTION REFORM ACT OF 1983, at 1 (Nov. 17, 1983). The legislation sought to accomplish this by "mandat[ing] provision of counseling services and extra protections for natural parents who are under a great deal of stress when making the complex decisions surrounding relinquishment." Id. As one witness testifying before the Council Committee on the Judiciary in support of the legislation stated, the bill would "support efforts to return relinquished children to their birth families by allowing birth parents a definite period of time to rethink their decision [to relinquish their parental rights], especially after all the pressures and stresses are lifted, [so that] they will have one last opportunity to be sure that their decision is the best for them and their children." REPORT OF THE COMMITTEE ON THE JUDICIARY ON BILL No. 5-135, DISTRICT OF COLUMBIA RELINQUISHMENT FOR ADOPTION REFORM ACT OF 1983, at 4 (Nov. 16, 1983).
Other witnesses pointed out to the Council Committee considering the bill that the social service agencies did not have a good track record of preparing parents for relinquishment. Id. at 5-6. A number of suggestions for improvements in the bill were made by a variety of witnesses, and the Committee recommended the adoption of many to the Council. Interestingly, the director of the Child Advocacy Center even suggested that "an exact meaning of the term `verified writing' [in the legislation should be provided in the statute]." Id. at 5.
By enacting the legislation to provide a ten-day grace period within which birth parents could revoke a prior relinquishment of their rights, the Council apparently rejected the view expressed by opponents of the legislation that the existing law on revocation was adequate, see J.M.A.L. v. Lutheran Social Servs. of Nat'l Capital Area, Inc., 418 A.2d 133 (D.C.1980) (absent written consent of all parties, revocation only upon showing that relinquishment was not "voluntary" because induced by fraud, coercion, material mistake or other factors bearing on voluntariness), a view consistent with the practice of the courts of giving the highest priority in such cases to providing a stable environment for the child. It also appears to have rejected the warning that the legislation would discourage adoptions. Id. at 5-6. At least insofar as the legislative history reveals the Council's emphasis, the interests of the birth parents and the child in remaining a unit were of paramount concern.
This brief summary of the legislative history explains my approach in the instant case. The history reveals that the Council sought to address some of the problems in the instant case and highlights the importance of strictly construing the provisions of D.C.Code § 32-1007 (1987 Supp.). The legislative history makes clear that the Council was not only informed of differing views about the merits of the proposed ten-day grace period, but reaffirmed a District of Columbia policy that children should be raised by their birth parents notwithstanding the emphasis of the courts on stability for the child. Birth parents are to be afforded a specific period of time within which to consider whether or not they want *1268 to undo their prior decision to relinquish their rights to their child. Parents are to be fully informed, orally and in writing, by the social agency preparing the parents for relinquishment, of their right to revoke and given a period of time, free from the pressures and turmoil involved, in which to consider whether they have made the right decision in forever relinquishing their rights to their child.
This court must interpret a statute in accordance with the intent of the legislature. Rosenberg v. United States, 297 A.2d 763, 765 (D.C.1972). Upon so doing I conclude that the majority correctly decides that the verified writing requirement must be stated in writing as part of the relinquishment form given to birth parents prior to their decision to relinquish, but errs in applying a harmless error analysis that might diminish the full ten-day grace period, to which a birth parent is statutorily entitled, within which to reconsider the relinquishment decision. See ante at 1265 & n. 4. The mother's counsel persuasively points out in her brief to this court the coercive atmosphere surrounding the agency's efforts to obtain a signed relinquishment from the mother. At most I would apply harmless error to a finding that the mother was orally informed of the verified writing requirement for revocation at the time of relinquishment. This approach, at least, is consistent with the statute. See § 32-1007(h) (oral advice of rights).
I also conclude that the majority fails to come to grips with aspects of the record before us. The trial court's finding that "the [relinquishment] form [the mother] executed... fully explains her options and rights," ante at 1262, is clearly erroneous; since the relinquishment form did not provide the required notice that a revocation be in the form of a verified writing, it did not fully explain her options and rights. Indeed, to this day, I am unclear about what constitutes a "verified writing" under § 32-1007. Is a notarized (signature) writing sufficient? Must a witness also sign the revocation? If so, should the witness be a neutral third party as opposed to a social worker directly or indirectly involved in the relinquishment? Since the Council declined to define the term in the statute, a definition, based upon the Council's intent, surely should be provided in the rules authorized by the statute, id. § 32-1003 (1981 & 1987 Supp.), as well as in all future relinquishment forms.
Furthermore, in the absence of evidence that the mother was, in fact, advised or aware of the verified writing requirement, the trial court also erred in ruling that she had not effectively revoked her prior relinquishment when she informed her social worker's supervisor of her decision to revoke within ten days after signing the relinquishment form. The majority holds that if the trial court finds on remand that the mother was not informed or aware of the verified writing requirement, then the court must determine whether she orally revoked her relinquishment. Ante at 1264-1265. The government represents in its brief on appeal that, "It is undisputed that the mother stated [in the conversation with her social worker's supervisor on the second day of the ten-day grace period] that she had changed her mind and wished to withdraw the relinquishment of her parental rights." It follows then that the mother effectively revoked at that time. Thus, in my view, the majority errs in focusing on events occurring after this telephone call. The conversation on the ninth day (which was initiated by the social worker, not the mother, as the trial court erroneously found) is irrelevant in determining whether the mother effectively revoked on the second day. Under the same reasoning relied upon by the majority, ante at 1265 n. 6, any "wavering" of the mother's resolve after her effective revocation on the second day could not reinstate her relinquishment which had been already revoked.
In addition, I think the majority errs in not providing guidance for the trial court upon remand with respect to the proper allocation of the burden of proof. Since I conclude that the relinquishment was invalid, or alternatively, that there was an effective revocation, I would reverse and vacate the relinquishment of parental rights. But even under the majority's approach, I would hold that on remand the burden is on *1269 the government to show that the mother failed effectively to revoke, and if the trial court finds that the revocation was effective, the government would have to show that the relinquishment should nevertheless be given effect. O'Connell v. Koob, 16 App.D.C. 161, 169 (1900) ("even in the absence of any special relation between the parties, where a person gains a great and manifest advantage over another by a voluntary instrument, the burden of proof is undoubtedly thrown upon the person receiving the benefit"); Blum v. Blum, 59 Md.App. 584, ___, 477 A.2d 289, 294 (1984) ("When a confidential relationship has been shown to exist ... the burden [of proof] is upon the dominant party to establish that the agreement was fair in all respects."); Robert O. v. Ecmel A., 460 A.2d 1321, 1323 (Del.1983) ("if the parties stand in a confidential or fiduciary relationship ... `equity raises a presumption against the validity of a transaction by which the superior obtains a possible benefit at the expense of the inferior, and casts upon him the burden of showing affirmatively his compliance with all equitable requisites.'" (citation omitted)). The latter, I submit, would appear to be an impossible burden to meet in view of the Council's intent in amending the law on revocation of relinquishments of children for adoption. See COMMITTEE REPORTS, supra. The government's suggestion that the legal standard of J.M.A.L. v. Lutheran Social Servs. of Nat'l Capital Area, Inc., supra, 418 A.2d 133, applies in determining the validity of a relinquishment fails to consider the Council's intent in providing a grace period for revocation.
I agree with the majority's holding that the right to counsel provided by D.C.Code § 16-2304(b)(1) (1987 Supp.) for a parent who is invoked in a neglect proceeding includes a right to counsel when a neglect proceeding leads to a proceeding to terminate parental rights. The latter is no less than the ultimate resolution of the neglect proceeding, and denial of the right at the termination stage of the proceedings, the most critical stage of the neglect proceeding, hardly makes sense.
NOTES
[1] D.C.Code § 32-1007(f) (1987 Supp.) provides in relevant part:

Except in proceedings for adopting, no parent may voluntarily assign or otherwise transfer to another his rights and duties with respect to the permanent care and control of a child under 16 years of age, unless such relinquishment of parental rights is made to a licensed child-placing agency. Such relinquishment of parental rights shall be a statement in writing signed by the person relinquishing such parental rights who shall subscribe his name thereto and acknowledge the same before a representative of the licensed child-placing agency in the presence of at least 1 witness. Each transfer or relinquishment of parental rights and any revocation of said relinquishment shall be recorded and filed by the child-placing agency in a properly sealed file in the Family Division of the Superior Court for the District of Columbia within 20 days after the expiration of the revocation period.
This provision became effective in 1984.
[2] D.C.Code § 32-1007(c) (1987 Supp.) provides:

Any relinquishment of parental rights executed by a single natural parent ... may be automatically revoked by a verified writing executed by the single parent ... and submitted to the agency within 10 calendar days of executing a legal relinquishment.... If the 10th day falls on a Saturday, Sunday, or legal holiday, the deadlines for filing the revocation shall be extended to the next working day. No relinquishment of parental rights shall be considered final until the revocation period has expired with no revocation having been made by the natural parent. Automatic revocation of relinquishment can be exercised only once.
[3] See, e.g., Askin v. District of Columbia Rental Housing Commission, 521 A.2d 669 (D.C.1987) (rule failed to state whether fifteen-day period for filing of motion to reconsider begins to run from date when order was entered or when it was postmarked); Bailey v. District of Columbia Department of Employment Services, 499 A.2d 1223 (D.C.1985) (language regarding petition for review suggested reason might be given that would excuse untimely filing); Ploufe v. District of Columbia Department of Employment Services, 497 A.2d 464 (D.C.1985) (notice of ten day period to appeal failed to specify whether calendar days or work days).
[4] Theoretically, R.R. could have learned of the verified writing requirement before July 15 but after her oral indication of a desire to revoke on July 5. We do not address what her rights and obligations would be under those circumstances.
[5] We agree with the trial court that an oral statement made amidst uncertainty cannot effect a revocation. In light, however, of DHS's apparent failure to inform R.R. of the statutory procedures for revoking her relinquishment, we must conclude that if R.R., as a result, was ignorant of the verified writing requirement, that requirement does not preclude her from effecting a revocation without a writing. Whether she did revoke depends upon a judicial determination that, in the words of the trial court, "she truly intended to revoke." We believe that, under the circumstances, her true intent is the controlling factor, and the lack of a verified writing does not preclude consideration of that factor.
[6] Should the court find that R.R. had revoked before the ninth day, her telephone statement on that day expressing, once again, a wish to relinquish would not constitute a second relinquishment because of her failure to comply with the formalities for relinquishing parental rights under § 32-1007(f), supra note 1. The reasoning that supports the possibility of an oral revocation, despite the statutory requirement for a verified writing, does not create a similar possibility with respect to relinquishment. Whereas R.R. may have reasonably relied on an assumption, absent positive information to the contrary, that revocation may be oral, her lack of knowledge regarding the precise procedures for revocation could not have provided a basis for her to believe that relinquishment may be accomplished orally.
[7] R.R. was not well educated and had a history of mental illness. We have no idea how these attributes would affect her capacity to waive the right to counsel. We do know that they evidence why parents subject to the neglect system are entitled, by statute, to counsel.